UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA
DAVENPORT DIVISION

| | |
|---|---|
| ARCHER-DANIELS-MIDLAND COMPANY, | No. 3:10-cv-00100 |
| Plaintiff, | |
| v. | **DEFENDANT'S REPLY BRIEF IN SUPPORT OF MOTION TO EXCLUDE EXPERT OPINIONS PURSUANT TO <u>DAUBERT</u> AND RULE 702, OR IN THE ALTERNATIVE, TO STRIKE EXPERT OPINIONS AS IMPROPER REBUTTAL OPINIONS PURSUANT TO RULE 26** |
| ROBINSON INDUSTRIES, INC. | |
| Defendant. | |

Defendant Robinson Industries, Inc. submits this Reply Brief in Support of its Motion to Exclude Expert Opinions Pursuant to <u>Daubert</u> and Rule 702, or on the Alternative, to Strike Expert Opinions as Improper Rebuttal Opinions Pursuant to Rule 26:

## TABLE OF CONTENTS

I.     Introduction ................................................................................................................. 2

II.    Sayer's non-integer 4-nodal theory has not been tested ...................................... 4

III.   Sayer's non-integer 4-nodal theory has not been peer reviewed ........................ 9

IV.    Sayer's non-integer 4-nodal theory has not been generally accepted ............................. 11

V.     Sayer's purported exclusion of other causes does not make his opinion reliable ............. 13

VI.    Errett's opinion and a lack of drawings do not excuse Sayer's dramatic change of opinion ................................................................................................................. 14

VII.   Sayer's April 17, 2012, report completely changing his theory is not appropriate supplementation or rebuttal, and is not substantially justified or harmless ...................... 19

VIII.  Conclusion ................................................................................................................. 22

I.     Introduction

In its resistance, ADM has attempted to subtly shift the Court's focus of inquiry from the specific causation opinion offered by Sayer, now premised on the non-integer 4-nodal diameter mode, to non-specific discussion of general scientific concepts of resonant excitation.  However, Robinson is not challenging the accepted general scientific concept that under certain circumstances a resonant excitation may occur in the operation of the fan arising from the coincidence of structural and dynamic frequencies.  ADM then goes on to adopt this over-generalized inquiry and apply the Daubert factors to it in an attempt to show that the general principle of resonant excitation has scientific support.  However, that is not the issue raised by Robinson's Daubert motion attacking Sayer's non-integer 4-nodal causation theory.  It is that theory that is the proper subject of this Court's inquiry and whether that theory passes the Daubert test.  ADM's obvious effort to re-frame the real issue, and thereby avoid it, should be rejected.

The Court must not be distracted by ADM's reliance upon the general scientific principles involving resonance arising from the coincidence of two frequencies from the real issue of whether there is reliable scientific support for Sayer's theory that the 4-nodal diameter mode is excitable by blade pass pulsation frequency ("BPPF") in a 10-bladed fan.  See Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 153-54 (1999) ("[T]he specific issue before the Court was not the reasonableness in general of a tire expert's use of a visual or tactical inspection to determine whether overdeflection had caused the tire treads to separate from its steel-belted carcass. . . .  The relevant issue was whether the expert could reliably determine the cause of this tire's separation.") (emphasis original).  As the Court observed in Buck v. Ford Motor Co., 810 F. Supp. 2d 815, 831 (N.D. Ohio 2011) . . . "a wholesale, unexplained reliance on those [general

scientific] principles as the sum total of an expert's methodology does not pass *Daubert*."
ADM's and Sayer's repetitive reliance on the general concept of resonant excitation does not
give Sayer's opinions the reliability required.

While ADM in its Resistance makes a show of trying to demonstrate that Sayer's non-
integer 4-nodal causation theory is reliable pursuant to an application of the Daubert factors, in
actuality, ADM has simply doubled-down on Sayer's *ipse dixit*.   However, before taking up
ADM's incorrect analysis of the Daubert factors as applied to Sayer's opinion, Robinson points
out to the Court several issues raised by Robinson with respect to the unreliability of Sayer's
opinion that are not contested or given only passing reference by ADM.

First, ADM does not contest Robinson's extended discussion of the key importance of the
integer relationship principle as part of the methodology consistently relied upon by Sayer to
determine the cause of a fan failure due to high cycle fatigue.  (Robinson Brief at p. 8).  ADM
does not take issue with Robinson's demonstration that Sayer has time and time again followed
the methodology of the integer relationship principle to identify potential frequencies of concern
both in the manufacturing of the fans and in investigating fan failures.  (Robinson Brief at pp.
14-17).  To rationalize Sayer's departure from the application of the integer relationship principle
here, ADM simply continues to rely upon Sayer's unscientific self-proclamations, such as his
deposition testimony that "one cannot discount the 4-nodal diameter mode as being a sensitive
mode to blade pass pulsation."  (ADM Brief at p. 8) (App. 149).

Second, ADM's resistance is also very short with respect to the unreliability of Sayer's
crack analysis to support his 4-nodal theory.  (Robinson Brief at pp. 27-28).  ADM provides no
explanation whatsoever as to why, if Sayer's 4-nodal theory is reliable, there were cracks at 13
blade locations, rather than at only 4 blade locations, and no explanation as to why there were no

cracks in the center plate of the failed fan, which is where Sayer admits the highest stresses would occur if the 4-nodal mode was the cause.  (Robinson Brief at pp. 27-28).

Further, other than simply repeating Sayer's flat refusal to accept Errett's adjustments of the 4-nodal frequency for the stress stiffening effects of operation (taking it out of the plus or minus 3% exclusion zone) (ADM Brief at p. 18), ADM does nothing to explain Sayer's unusual refusal in this litigation to accept a stress-stiffened frequency value when that has been his customary methodology in non-litigation contexts involving the investigation of fan failures. See Exhibit 149 (Sayer's analysis of redesigned fans for ADM gas boiler units) (App. 412-416); Exhibit 151 (Sayer article identifying 4-nodal diameter mode as frequency of concern in 12-bladed fan, but concluding "this fan wheel was strain gauged to evaluate the dynamic stresses during operation and confirmed that the stress stiffened value for the natural frequency [of the 4-nodal diameter mode] was not a problem.") (App. 431).

II.      Sayer's non-integer 4-nodal theory has not been tested

ADM claims "Sayer has tested his theory."  (ADM Brief at 15).  What "theory", exactly? He has not, by any test or by any other methods established scientifically that the 4-nodal diameter mode would be sufficiently sensitive to blade pass pulsation frequency (BPPF) or that the BPPF would generate sufficient input force to cause excitation of the 4-nodal diameter mode. The other "tests" discussed by ADM certainly do not demonstrate that.  First, the "bump test" only identifies the natural frequencies of the fan.  In fact, Sayer rejects that the amplitude (force) of a natural frequency as shown by a bump test may properly be used to determine or quantify the sensitivity of a natural frequency.  (App. 359-60).

Second, the calculation of the BPPF is not a test.  It is a simple mathematical calculation where the number of blades (10) is multiplied by the product of the fan's RPM (1180) divided by

60.  (App. 241-242).  This is not an experimental "test" proving in any way Sayer's 4-nodal theory of causation.  Similarly, an FEA also is not a test or an analysis to calculate the sensitivity of the 4-nodal mode or the input force generated on that nodal mode by BPPF.  As explained by both experts, an FEA is used to identify the structural modes corresponding to the natural frequency identified by the bump test.

That leaves Sayer's "forced response analysis".  With respect to Sayer's "forced response analysis," ADM first claims that it was an experiment or test[1] used by him to demonstrate "only general scientific principles," (ADM Brief at 18), not to recreate or duplicate the actual conditions within the fan that resulted in his opinion on the excitation of the 4-nodal diameter mode.   However, ADM never articulates what abstract, scientific principle is actually demonstrated by Sayer's analysis.  Of course, "the distinction between evidence offered as a reconstruction of the accident and evidence offered to demonstrate scientific principles is very difficult to draw."  McKnight v. Johnson Controls, Inc., 36 F.3d 1396, 1402 (8th Cir. 1994).  If there is any risk of misunderstanding by the jury as to whether the test or experiment was intended to recreate actual conditions, the court should require a showing of substantially similar conditions before admitting a test or experiment.  Id.  There is such a risk here.

ADM has not even begun to establish the required evidentiary foundation here because Sayer has no idea and has offered no opinion as to the actual amplitude or force generated by the excitation of the 4-nodal diameter mode, or the actual pressure or force generated by the BPPF at a blade tip of the fan.  (See Robinson's Daubert Brief at 25-26).  Without some rational scientific basis to tie his admittedly assumed factors used by Sayer in his forced response analysis to the

---

[1] An FEA is not a scientific experiment or test as properly understood.  It is a computer-aided mathematical analysis based upon or from selected inputs.  See Seibel v. JLG Industries, No. 3-98-cv-60183, 2002 WL 34443995 at *9 (S.D. Iowa July 18, 2002) (expert's excluded opinion "based on mathematical calculations and analysis, not on any actual testing.")

actual factors existing with the fans at or about the times of their failure, Sayer's forced response analysis proves nothing and provides no support for the reliability of his opinions.

Nevertheless, Sayer asserts that the purpose of his forced response analysis was to "demonstrate the sensitivity" of the 4-nodal diameter mode in relation to the blade pass pressure pulsations.  (App. 157).  While he claims that the input force of 800 pounds per square inch of load to each fan blade used to generate this analysis was considered by him to be a "modest dynamic force" (App. 159), this begs the question -- "modest" as compared to what?  The only relevant comparison point is the force actually exerted on the fan by BPPF, but Sayer has admitted "we really don't know what the exact force is at the blade pass pulsation area." (App. 158).  He admits that there is no analysis to accurately determine the actual force applied to the fan by the BPPF.  (App. 159).  Therefore, in terms of providing any scientific support for the reliability of Sayer's opinion, his forced response analysis is of no probative value whatsoever because it lacks any basis in reality.

Sayer's 4-nodal theory apparently cannot be tested.  Sayer admits that to determine the actual force generated by the BPPF, "it would have to be measured somehow." (App. 160).  He testified:  "Someone would have to have a pressure transducer that actually travels with the fan wheel."  Id.  He did not try to undertake this actual measurement of the force applied by the BPPF.  (App. 161).  He is not aware that it has ever been measured.  Id.  Sayer has also conceded that he has never attempted to measure the amplitude of the excitation of the 4-nodal diameter. (App. 169).  ("I have not, because it is not possible.")  He has no calculation that purports to measure how much amplitude would be generated by excitation of the 4-nodal diameter mode by BPPF.  (App. 169).

ADM and Sayer must demonstrate scientifically that the non-integer 4-nodal mode is sensitive to BPPF because the coincidence of a natural frequency of the fan with the BPPF does not, *ipso facto*, give rise to a resonance condition. (Supp. App. 5). Sayer has admitted that all nodal diameters are not "the same". (App. 149). But, there are in fact no real world tests or experiments that Sayer or anyone else has ever conducted to verify that the 4-nodal diameter mode may be excited by the BPPF in such a manner as to cause high cycle fatigue in a steel fan.

"The first, and perhaps the most important, factor in a design defect case is whether or not the theory has been tested." Estate of Bruess v. Blount Int'l. Inc., No. C09-2055, 2011 WL 2680760 at *16 (N.D. Iowa July 8, 2011). ADM suggests, however, that if an expert's opinions cannot be subjected to a scientific test or experiment that this Daubert factor may be disregarded. (ADM brief at 17). ADM is mistaken.

First, the case cited by ADM for this proposition, Shuck v. CNH America, LLC, 498 F.3d 868 (8th Cir. 2007), did not involve the application of hard scientific principles; rather, it involved the investigation into a combine fire and opinions of a fire causation expert and a mechanical expert based upon their observations of the fire-damaged combine engine. Id. at 872-73. Under those circumstances, the court concluded that "observations coupled with expertise" may be generally sufficient to form the basis of admissible expert opinion. Id. at 875. The hard-science context of ADM's complex claims here are markedly different than those in Shuck.

Second, it is precisely the untestable nature of Sayer's opinions that should compel this Court to exclude them as unscientific -- not to allow them because they cannot be tested. That would turn Daubert on its head. Under Daubert and Federal Rule of Evidence 702, "[a]n expert must offer good reason to think that his approach produces an accurate estimate using

professional methods, and this estimate must be testable." Zenith Electronics Corp v. WH-TV Broad. Corp., 395 F.3d 416, 419 (7th Cir.), cert. denied, 545 U.S. 1140 (2005). "[C]onclusions that are not falsifiable aren't worth much to either science or the judiciary." Id. "[U]testable say-so" must be excluded. Durkin v. Equifax Check Servs., Inc., 406 F.3d 410, 421 (7th Cir. 2005). Id. "Untested hypotheses, even if plausible, are insufficient to satisfy Rule 702." Buck, 810 F. Supp. 2d at 826 (citing Rider v. Sandoz Pharm. Corp., 295 F.3d 1194, 1202 (11th Cir. 2002)); see also Caraker v. Sandoz Pharms. Corp., 188 F. Supp. 2d 1026, 1031 (S.D. Ill. 2001) ("hallmark" for reliability of an expert opinion is "the scientific method, i.e., the generation of testable hypothesis that are then subjected to the real-world crucible of experimentation, falsification/validation, and replication"); Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 593 (1993) ("The criterion of the scientific status of a theory is its falsifiability, or refutability, or testability.").

"The 'testability' requirement is a threshold requirement aimed at excluding pseudoscience from the courtroom. A theory that is untestable, is unfalsifiable and of no practical value in the courtroom." Brumley v. Pfizer, Inc., 200 F.R.D. 596, 602 (S.D. Texas 2001); Dow v. Rheem Mfg. Co., Nos. 09-13697-BC, 10-10758-BC, 2012 WL 1621368 at *2 (E.D. Mich. May 9, 2012) (where expert claimed he could not test his hypothesis "because of unknown variables", the court found the expert "offered an untested hypothesis (indeed, by his own account, an untestable hypothesis)" and therefore, "did not offer an opinion based on the scientific method, but speculation"). Also, "[t]esting, which is actually performed, must be appropriate and must analytically prove the expert's hypothesis." Presley v. Lakewood Eng'g & Mfg. Co., 553 F.3d 638, 646 (8th Cir. 2009). As explained, Sayer's forced response analysis is neither appropriate nor tends to prove his hypothesis. See Pro Service Auto, LLC v. Lenan

Corp., 469 F.3d 1210, 1215-16 (8th Cir. 2006) (court held expert failed to satisfy Daubert standard where expert "provided no testing or mathematical analysis to quantify, even as a rough estimate", how much heat would be transferred through "hot spots" in the heater cabinet).

Of course, a known error rate is a factor in evaluating the reliability of Sayer's 4-nodal theory.  However, Sayer "did not offer the results of any testing to demonstrate that his theory was accurate, and where there is no testing, there cannot be a known rate of error for the district court to consider."  Smith v. Cangieter, 462 F.3d 920, 924 (8th Cir. 2006).   Therefore, this Court must decline ADM's invitation to dispense with requiring proof that Sayer's non-integer 4-nodal theory is testable and has been tested to verify his causation theory.  Because it is untestable, it is scientifically unreliable.

III.     Sayer's non-integer 4-nodal theory has not been peer reviewed

Next, ADM asserts that Sayer's theory is based upon or supported by peer-reviewed research.  (ADM Brief at p. 19).  It is not.  This argument is directly contrary to Sayer's admissions at deposition (see Robinson Brief at pp. 22-23), and must be disregarded.  Whatever of Sayer's own papers ADM points to on the issue of resonance excitation, they are not on point with respect to his specific non-integer 4-nodal causation theory.  ADM cannot cite from any Sayer publication or the publication, of any other recognized expert in the industry for that matter, any statement that the 4-nodal diameter mode is sensitive to BPPF in a fan where that nodal diameter is not an integer of the number of blades of the fan.  A showing of peer review on such a novel premise is important because "submission to the scrutiny of the scientific community is a component of 'good science' in part because it increases the likelihood that substantive flaws in methodology will be detected."  Peitzmeier v. Hennessy Industries, Inc., 97 F.3d 293, 297 (8th Cir. 1996).  In any event, Sayer's repetition of general theories of resonant

excitation in an article[2] does not make his opinion any more reliable.  See Alliance for Natural Health U.S. v. Sebelius, 786 F. Supp. 2d 1, 18 n.16 (D.D.C. 2011) ("The key question is whether a study provides <u>credible evidence for the plaintiffs' specific claim</u>, not whether it is scientifically sound in some generic sense.") (emphasis original).

Throughout its Daubert brief, ADM relies upon Lauzon v. Senco Products, Inc., 270 F.3d 681 (8th Cir. 2001).  However, the reliability of Sayer's opinion is actually undercut by that case.  The product in Lauzon was a pneumatic nailer.  The Court applied the 4 Daubert factors to assess the reliability of plaintiff's expert mechanical engineer who testified the nailer was defective.  In contrast to Sayer, that expert conducted real-world tests to verify his theory of causation, id. at 688-689; he had published in a peer-reviewed journal an article that presented "the identical conclusion" or "the very essence" of the theory he testified to in the litigation, id. at 690-91; two other industry publications not authored by the expert supported the opinions, id; and the court noted the "general acceptance factor dovetails with the prior factor, peer review," concluding that the peer-reviewed literature showed general acceptance of the theory.  Id. at 691.  Sayer's opinion does not fare well when compared to the expert opinion that passed muster in Lauzon.

ADM also cites Glasstech, Inc. v. Chicago Blower Corp., 675 F. Supp. 2d 752 (N.D. Ohio 2009), to bolster the reliability of Sayer's opinion.  Sayer was one of the experts mentioned in the Glasstech decision.  However, his opinions in that case were not challenged pursuant to Daubert.  Further, the specific causation opinion he expressed was different than the one he has expressed in this case.  The fan at issue in Glasstech was a quench fan, not an induced draft fan.  He did not rely upon his non-integer 4-nodal theory in Glasstech.  Rather, there he opined that a natural frequency of the fan was excited by the rotor critical speed of the fans.  Id. at 758.

---

[2] ADM  has not laid the foundation to show that any of Sayer's articles were peer-reviewed.  ADM does not cite any testimony or record evidence that Sayer's peers' studied and vetted any of his articles prior to publication or that any of his publications underwent any sort of formal scientific review.

In addition, ADM touts Sayer's other publications (none of which address the precise issue here) and long career as a fan engineer.  (ADM Brief at 25-26).  However, the fact that Sayer has worked in the field for decades but has never had his non-integer 4-nodal theory reviewed "weighs heavily against admitting his testimony."  Buck, 810 F. Supp. 2d at 833 ("While Buck is correct that the lack of peer review is not dispositive of reliability, the fact that [his expert], who has worked in the field for decades, has never had this theory reviewed weighs heavily against admitting his testimony").  Sayer's theory that the 4-nodal diameter mode may be excited by BPPF in a ten-bladed fan has "not been scrutinized by the scientific community" because there are no peer-reviewed articles in support of this specific opinion.  Smith, 462 F.3d at 924.  Under these facts, it cannot be admitted into evidence.

IV.    Sayer's non-integer 4-nodal theory has not been generally accepted

The next factor discussed by ADM is "general acceptance" in the relevant scientific community.  (ADM Brief at 22-24).  As the court noted in Lauzon, "[t]he general acceptance factor dovetails with the prior factor, peer review."  270 F.3d at 691.  That is, if an expert's specific causation theory has gained even a modicum general acceptance in the relevant scientific community, there ought to be some peer-reviewed publications by the expert and others which directly substantiates the specific causation theory proffered.  Sayer concedes there are no such publications.  (App. 151-155).  ADM cannot present any such peer-reviewed literature in the relevant scientific community supporting Sayer's specific causation theory.  Even in his self-serving testimony, Sayer has not, himself, dared to assert that his non-integer 4-nodal theory, in his opinion, is generally accepted in the industry.  See Peitzmeier, 97 F.3d at 297-98 (plaintiffs "offer no testimony regarding the general acceptance" of their expert's theory or his methodology).  Evidence in the record, however, indicates that Sayer's four nodal theory is

not generally accepted.  The "four nodal diameter mode is not considered to be sensitive to blade pass excitation for a 10-bladed fan wheel."  (App. 501).  One major manufacturer of large centrifugal power plan fans does not consider any nodal diameter modes to be excitable by BPPF.  (App. 504).

Again, the issue in this case is not whether the basic, general scientific principles of resonant excitation are generally accepted in the scientific community, but whether Sayer's idiosyncratic, non-integer 4-nodal diameter theory is so accepted.  ADM has failed to make a sufficient showing of such acceptance.  Of course, Sayer's opinion may not be excused from meeting the Daubert standard simply because ADM may claim it is emerging in the industry or previously unknown.  After all, the whole purpose of Daubert is to allow the district court to serve "as a gatekeeper for the admission of novel scientific evidence."  United States v. Boswell, 270 F.3d 1200, 1204 (8th Cir. 2001).

ADM likes to assert that Robinson is simply trying to engage the court in a factual dispute between the two experts.  However, this Daubert motion is not a situation of resolving conflicting expert testimony.  It is a case where Sayer, due to the unreliability of his heretofore unheard of non-integer 4-nodal theory, has failed to put forth competent evidence to even create a conflict.  "Without competent evidence on both sides, there can be no 'battle of the experts' in which a fact-finder could weigh competing claims."  In re Baycol Prods. Litig., 596 F.3d 884, 892 (8th Cir. 2010).

ADM also likes to cite Errett's purported testimony[3] that, in effect, anything is "possible" (ADM Brief at 24).  But that cannot help support the reliability of Sayer's opinions or any

---

[3] Errett only testified in response to ADM's compound question that it was "possible" that the "4 or 5" nodal mode could have been involved (ADM App. at 148) (emphasis added).  His testimony in this regard is actually consistent with the integer relationship principle that provides some scientific support for the possibility that the 5-nodal mode (Sayer's first theory) could have been involved if it was in the BPPF exclusion zone.

general acceptance of his theory.  See Estate of Bruess, 2011 WL 2680760, at *16 (court noted

that opposing expert's testimony that the proposed alternative design was "possible . . . does

nothing to support the reliability of [plaintiff's] expert" because it is the plaintiff's burden to

prove by a preponderance of evidence that his testimony is reliable).  ADM has not carried that

burden.

V.      Sayer's purported exclusion of other causes does not make his opinion reliable

        ADM asks this Court to find Sayer's opinion is reliable because he has supposedly

considered and eliminated other possible causes for the fan failure.  (ADM Brief at 26-27).

However, ADM's approach is flawed.  An engineer's supposed elimination of other alternative

causes for an event is analogous to a doctor performing a differential diagnosis.  See Buck, 810

F. Supp. 2d at 829-30 (court observed engineer's method of "eliminating each of the potential

causes until one that cannot be ruled out is isolated" is essentially the same as differential

diagnosis).  In that context, a proper differential diagnosis must first begin with an expert "ruling

in" plausible causes of an injury.  Junk v. Terminix Int'l. Co., 628 F.3d 439, 449 (8th Cir. 2010).

Then the expert "rules out" less likely causes until the most likely cause remains.  Id.  However,

if the cause favored by the expert has not been reliably ruled in, this elimination of other possible

causes does not make his opinion reliable.  Id.  ("Without a scientific basis for including unsafe

chlorpyrifos exposure in her differential diagnosis, [the expert's] opinion amounted to

speculation").

        Sayer has not reliably "ruled in" his non-integer 4-nodal theory.  Similarly, ADM's claim

that Sayer's change of opinion is only "a change in the risk of failure" (ADM Brief at 31) is a

gross mischaracterization of his new opinion, and improperly assumes as present that which is

absent - the subject of Robinson's motion -- that there is no reliable scientific evidence that a non-integer nodal diameter poses any risk of failure due to blade pass frequency.

VI.    Errett's opinion and a lack of drawings do not excuse Sayer's dramatic change of opinion

Weaved throughout ADM's brief is the claim that Robinson's expert Errett changed or modified his opinion, so Sayer had to supplement his opinion.  First, when ADM asserts, as it does, that Sayer has not really changed his opinion, it is simply in denial.  ADM insists that because Sayer's causation opinion has always been that a resonance condition involving a natural frequency of the fan [of some sort] and the BPPF caused the failure, the change in theory from the 5 nodal to the 4 nodal as the natural frequency of the fan involved is only a "modification" (ADM Brief at 2), or that Sayer merely "refined his opinions."  (ADM Brief at 11).  This is obviously a specious characterization.  ADM cannot escape that Sayer, himself, admitted that his initial identification of the 5-nodal diameter mode frequency as the cause of the failure was "the underlying basis" for his causation theory, and was wrong.  (App. 128-130). Sayer further admitted in his second deposition that his new assertion of the 4-nodal diameter mode as the cause of the failures "changed" what he believed to be the natural frequency of the fan involved.  (App. 146).

ADM attempts to obscure this key change in Sayer's opinions by overgeneralization, again -- rationalizing that this is not really a change in his opinion because his opinion has always been that the fans failed due to a resonance condition involving some natural frequency of the fan.  This rationalization is frankly absurd.  True scientists in the field recognize dramatic differences in the characterization and properties of the different nodal diameter modes.  As an analogy, consider a doctor who initially diagnoses a patient with lung cancer.  When the lab results are returned, however, he discovers that the patient has liver cancer, not lung cancer.  The

doctor then diagnoses liver cancer, but he asserts that his diagnosis really has not changed because his diagnosis was always, generically, cancer.   As explained in Robinson's brief, the change in Sayer's theory from the 5 nodal to the 4 nodal is not an inconsequential "refinement," as ADM tries to characterize it, because his opinion is now based on a natural frequency that does not follow the integer relationship principle, has never been posted before in history, even by Sayer, and certainly never tested.

Second, Sayer cannot blame his change of opinions on Al Errett's initial FEA results, which he claims to have relied upon, but has admitted he misinterpreted.  This is one of ADM's red herrings.   Sayer admits there is a one-to-one correspondence or correlation between the natural frequencies of a fan as shown by a bump test and the natural frequencies identified by FEA.  (App. 92; Supp. App. 10).  That is, the various nodal natural frequency modes of a fan fall on an ascending scale with the first mode (called the wobble mode) which has the lowest frequency, and the 9th mode (which is the 5-nodal diameter mode) having the highest frequency. As one moves up the scale from one to nine sequentially, the frequencies associated with the modes increase.  The frequency of the second or "umbrella mode" is higher than the first mode, the frequency of the third mode (the 2-nodal diameter mode) is higher than the second mode, and so on.  In order to properly identify a particular mode, it is necessary to line up the bump test results from lowest to highest frequencies, and then additionally, do a one-to-one correlation between those frequencies and the modal scale.  (App. at 502-503).  The following table derived from Errett's report (App. 503) (Sayer's second report includes the same chart) illustrates this one-to-one correspondence:

**TABLE 1**
**FINITE ELEMENT RESULTS VERSUS TEST RESULTS**
**FOR FAN WHEEL MODES**

| MODE | DESCRIPTION | TEST RESULTS | DEAC 2009 FEA WITH NOMINAL THICKNESSES | DEAC FEA WITH INCREASED THICKNESSES | SAYER FEA WITH INCREASED THICKNESSES |
|------|-------------|--------------|----------------------------------------|-------------------------------------|--------------------------------------|
| 1 | Wobble Mode | 40.0 Hz. | 34.1 Hz. | 36.9 Hz. | 39.3 Hz. |
| 2 | Umbrella Mode | 70.5 Hz. | 61.2 Hz. | 67.0 Hz. | 67.2 Hz. |
| 3 | Two-Nodal Diameter Mode | 99.0 Hz. | 91.8 Hz. | 94.8 Hz. | 98.6 Hz. |
| 4 | Internal Nodal Line | 120.5 Hz. | 110.2 Hz. | 115.9 Hz. | 121.0 Hz. |
| 5 | Out-of-Phase Torsional | 126.5 Hz. | 118.5 Hz. | 122.1 Hz. | 127.3 Hz. |
| 6 | Internal Two-Nodal Mode | 151.0 Hz. | 137.8 Hz. | 144.4 Hz. | 149.6 Hz. |
| 7 | Three-Nodal Diameter Mode | 165.0 Hz. | 148.5 Hz. | 156.9 Hz. | 163.6 Hz. |
| 8 | **4-Nodal Diameter Mode** | **195.5 Hz.** | **175.2 Hz.** | **184.8 Hz.** | **189.8 Hz.** |
| 9 | 5-Nodal Diameter Mode | 207.0 Hz. | 185.4 Hz. | 195.4 Hz. | 199.6 Hz. |

This table shows the bump test results in the third column ("Test Results"), the results from Errett's initial FEA in the fourth column ("DEAC 2009 FEA"), the results from Errett's subsequent FEA in the fifth column ("DEAC with Increased Thicknesses"), and Sayer's FEA results in the last column. The key one-to-one correspondence between the 4-nodal and 195.5 Hz frequency (and the frequencies as calculated by FEA for the 4-nodal) of concern is highlighted. In his November 30, 2011, litigation report, Sayer identified the natural frequency of the wheel at 195.5 Hz as the frequency of concern. (App. 530). In that report, he stated: "The natural frequency associated with the 5-nodal diameter mode . . . was around 195.5 Hz and very close to blade pass frequency. . . ." (App. 534). However, as shown by the table, had he properly lined up the modal scale using the accepted one-to-one correspondence, which he failed to do, that frequency obviously corresponds with the 4-nodal diameter mode, not the 5-nodal.

In his deposition testimony, Sayer admitted he did not conduct a one-to-one correspondence between the bump test results and Errett's initial FEA modal scale, and therefore, misinterpreted Errett's initial FEA results.  He testified as follows:

> Q.    It was after reviewing Mr. Errett's report that you recognized you needed to do a one-to-one correspondence adjustment to the FEA analysis; isn't that right?
> A.    This is correct.
> Q.    So it was Mr. Errett's report that alerted you to the fact you had not correctly interpreted the FEA result that you initially had?
> A.    That was indeed a possibility.
> Q.    That was likely, wasn't it?
> A.    That it was likely.
> Q.    And that one-to-one correspondence adjustment by an expert certainly would have been done upon looking at the very first FEA report analysis, correct?
> A.    With the data I had, that is correct.

(App. 148; Supp. App. 10).   As Sayer admits, Errett's initial FEA results in fact clearly and correctly identified the frequency of concern as the 4-nodal diameter mode.  Neither Errett's nor Sayer's subsequent FEA analysis changed that fact.[4]   Sayer simply got it wrong when he identified the frequency at issue as the 5-nodal diameter mode.  He now tries to blame this on Errett or a lack of engineering drawings to do his own FEA, when in fact it has always been his own failure to do the necessary one-to-one correspondence that produced his error.

---

[4] ADM asserts Errett changed his opinions (ADM Brief at 30).  That is incorrect.  Errett's subsequent FEA results did not alter, change or modify the relative relationship of the modes and frequencies as shown by the table.  His subsequent FEA did result in slightly higher frequency levels for each mode than his initial analysis because he increased in his subsequent analysis the thicknesses of the steel plate used in the fan to better approximate actual plate thicknesses.  Sayer adopted this same adjustment for plate thickness in his FEA analysis.  (App. 364).  This did not change any data relevant to the proper identification of the 4-nodal diameter mode.  All the FEA results under-predicted the actual natural frequencies as shown by bump test (i.e., the actual 4-nodal frequency by bump test is 195.5 Hz but the FEA results predicted 175.2 Hz, 184.8 Hz and 189. Hz).  This is an accepted phenomenon known to Sayer.  (Supp. App. 10) ("And the finite element analysis generally underpredict the actual experimental results by the amount that was underpredicted in the initial finite element analysis").  It is also wrong for ADM to assert that Errett otherwise "changed" his opinion.  Errett has had only one opinion, which was disclosed in his first report and has not changed.  That is that the high cycle fatigue failures were due to the excitation of the 2-nodal diameter mode during operation by ADM at very low (less than 20% open) damper setting.  (App. 440).  Another factor involved was a coincidence of the frequency of the 2-nodal diameter acoustic mode of the fan housing and a 2-nodal structural mode of the wheel.  (App. 441).

The engineering drawing issue is a red herring as well.  First, ADM's document requests are exceedingly broad, not even mentioning the word "drawings".  (ADM App. 273-78). Robinson produced its documents reasonably in advance of the due date for Sayer's opinion in this case.  (Supp. App. 43)  Included among that production were fan assembly drawings.  Id. ADM did not make a specific request or otherwise press Robinson for other drawings prior to the issuance of Sayer's November 2011 report.  Id.  ADM made no inquiry of Robinson about additional drawing until the week of February 6, when the parties convened in Pennsylvania for depositions of Robinson employees.  Id.  When further inquiry was made, Robinson identified for ADM the fan assembly drawings in its production.  Id.  Then, no further or other inquiry was made for drawings prior to Sayer's deposition of February 26, 2012.  (App. 106; Supp. App. 44). Within days of ADM's later specific request, Robinson produced the engineering drawings. (ADM App. 97).  It would have similarly done so had a specific request for them been made earlier, if they were so important to ADM or Sayer.

While Sayer knew he did not have any additional engineering drawings prior to his deposition on February 26, 2012, he offered his opinion that the 5-nodal diameter mode was the natural frequency involved in the failure without hedging or hesitation.  His testimony then confirmed that he had "all the information" he needed and had done "all investigation" he needed to render opinions that he believed to be "confirmable".  (App. 141-142).

ADM also overstates Sayer's "reliance" on Errett's initial work.  Sayer described his use of Errett's preliminary FEA results as only confirmatory of his previously formed opinion that the 5-nodal diameter mode was at issue.  (Supp. App. 4).  Without such confirmation, Sayer was "pretty confident" that the 5-nodal was involved.  (App. 116).  Prior to ever looking at Errett's preliminary FEA, Sayer testified:  "Based on testing that I have done on hundreds of fans, I was

pretty confident at that point [that the 5-nodal diameter was at 195.5 Hz]." (App. 116).  Again, before he ever saw Errett's results, by the time he wrote his January 18, 2009, pre-litigation report, he was "very confident that the most probable cause of the failure is excitation of 5-nodal diameter mode. . . ." (App. 118-19).

Of course, underlying Sayer's once confident 5-nodal theory, which lacked <u>any</u> confirmatory FEA analysis, is the integer relationship principle.  Further, Sayer did not at any time in his first report or his first deposition state that his opinions were at all qualified or conditional because he did not have enough information to form them.  (App. 149).  Sayer's mistake regarding the nodal diameter involved may actually be accounted for by the fact that he did not conduct an experimental modal analysis of the Robinson fans to identify the mode shapes associated with the natural frequencies identified during the bump test, which was his usual procedure.  (Supp. App. 11-12).  In any event, Sayer's own FEA based upon those engineering drawings did not provide him with any different or additional information to assist in the proper identification of the frequency of concern as the 4-nodal diameter mode.  If he had simply properly interpreted Errett's initial FEA results to begin with, he would not have made the mistake he did.

ADM's arguments attributing Sayer's mistakes to Errett's subsequent FEA analysis and the lack of more engineering drawings are simply smoke screens intended to cover Sayer's own mistakes and misinterpretation.

VII.  <u>Sayer's April 17, 2012, report completely changing his theory is not appropriate supplementation or rebuttal, and is not substantially justified or harmless</u>

As detailed above, Sayer cannot blame his need to do a supplemental report on Errett's work.  As explained, that claim and a purported lack of engineering drawings are smoke screens to cover Sayer's admitted failure to properly interpret Errett's initial FEA results in the first

place.  There was no new information in Errett's expert report that was not available to Sayer or that could have been available to Sayer had he not misinterpreted the FEA results, and decided to rely primarily upon his own "personal experience" for identification of the nodal diameter at issue rather than scientific testing.

Given the real reason for the change in Sayer's opinion, discussed above, Sayer's supplemental opinion with respect to the non-integer 4-nodal causation theory substantially changes his previously disclosed opinion without good reason, and is clearly not in rebuttal to any opinions offered by Robinson's expert.  Therefore, it is not a proper "supplement" pursuant to Federal Rule of Civil Procedure 26(e).  See Estate of Bruess, 2011 WL 2680760, at *6-7 (court held "supplemental" disclosure by plaintiff's experts regarding his design and testing of rollover protective system not proper supplementation pursuant to Rule 26(e)).  It is prejudicial, and incurably so, because it effectively "reversed" the order of expert designation and reports, allowing Sayer to first see Errett's opinions and analysis; and thereafter form his new opinions. He used Errett's report as a roadmap to identify and try to explain away all his errors.

Sayer's supplemental 4-nodal causation theory, and his further additional new opinions offered to buttress that opinion, completely frustrates the purpose of the scheduling order in this case and Rule 26(a)(2).  There is no question that a proper identification of the nodal diameter associated with the frequency of 195.5 Hz was central to any causation theory.  Sayer's new 4-nodal theory substantially changes that opinion by relying upon a non-integer nodal diameter, contrary to the integer relationship principle.  This new opinion was disclosed months after ADM was obligated to disclose their expert's opinions in support of its case in chief.  "If the court allows expert witnesses to substantially expand their opinions, and the basis and reasons for them, after the deadlines for doing so have expired, then it substantially undercuts the orderly

trial process." Estate of Bruess, 2011 WL 2680760, at *8.  The purpose of 26(a)(2) "is designed to alert the opposing party of expert opinions against which it must defend."  Id.  When an expert's opinion becomes a "'moving target'", such as Sayer's has become, that "purpose is frustrated."  Id.

No new information justifies Sayer's new theories and late supplementation.  Because Sayer simply misinterpreted FEA data and issued an erroneous opinion, ADM cannot properly claim a right to "supplementation" under Rule 26(b) because Sayer's prior disclosure was "'incomplete or incorrect.'"  "Rule 26(e) is not intended as a vehicle to shore up previous opinions." Estate of Bruess, 2011 WL 2680760, at *8   That is exactly what Sayer is doing here. ADM seeks to use "supplementation" to camouflage the fact Sayer came to a rash and incorrect conclusion about the nodal diameter at issue, despite having available to him all the information he needed to correctly identify the nodal diameter.  See Akeva L.L.C. v. Mizuno Corp., 212 F.R.D. 306, 310 (M.D.N.C. 2002) ("The court cannot accept a definition of supplementation which would essentially allow for unlimited bolstering of expert opinions. . . .  It does not cover failures of omissions because the expert did an inadequate or incomplete preparation").

Even if the Court concludes Sayer's new opinion is proper late supplementation, however, it was not substantially justified or harmless under Federal Rule of Civil Procedure 37(c)(1).  As discussed at length, it was not substantially justified because it arose out of Sayer's own error in reading Errett's preliminary FEA results.  It is also not harmless.  It reversed the order of expert disclosures and alerted Sayer to all his mistakes he had to correct after first seeing Errett's report.  That prejudice cannot be removed.  Robinson's counsel and Al Errett also incurred substantial additional fees and costs because of Sayer's late supplementation due to his own self-inflicted mistake. See Hess v. Ameristep, No. 06-3267, 2008 WL 4936726, at *3 (C.D.

Ill. Nov. 17, 2008) ("The additional cost and expense imposed on these defendants was not harmless.")   Also, Sayer's late and improper supplementation deprived Robinson of his "corrected" causation opinion for over five (5) months, which would have given Robinson that additional time to focus on the unreliability of his non-integer.   It presented Robinson with the Hobson's choice of standing on the scheduling order or having to re-depose Sayer and further supplement the opinions of its expert Errett, which ADM now cites to show no foul.   Accordingly, allowing Sayer's testimony, whether reliable or not, would not be harmless.   See Cont'l. Cas. Co. v. F-Star Prop. Mgmt., Inc., No. EP-10-CV-102-KC, 2011 WL 2887457, at *7 (W.D. Tex. July 15, 2011) ("A delay of even a few weeks in disclosing expert testimony disrupts the court's schedule and the opponent's preparation and is thus prejudicial.").   Of course, because Sayer's non-integer 4-nodal theory has flunked each of the Daubert factors, the procedural issues raised by Rule 26 will not be necessary to decide.

VIII.   Conclusion

For the foregoing reasons, Robinson requests that the Court grant its motion to exclude the expert opinions of Robert Sayer pursuant to Daubert and Rule 702, or in the alternative, to strike expert opinions as improper rebuttal opinions pursuant to Rule 26, and in particular, those opinions set forth in Sayer's "Supplement No. 1 to Expert Report" dated April 17, 2012, identified as Sections 3.0 (Opinions No. 2, No. 5-7, No. 10-14, 4.0 (to the extent it relies upon a 4 nodal theory), and 5.0 thereof, including all related opinions stated therein.

Respectfully submitted,

*/s/ Richard J. Sapp*
Richard J. Sapp          AT0006915
Thomas H. Walton       AT0008183
Ryan Koopmans          AT0009366
NYEMASTER GOODE, P.C.
700 Walnut Street, Suite 1600
Des Moines, IA  50309-3899
Telephone:  (515) 283-3100
Facsimile:  (515) 283-8045
E-Mail: rjs@nyemaster.com
           twalton@nyemaster.com
           rkoopmans@nyemaster.com
**ATTORNEYS FOR DEFENDANT
ROBINSON INDUSTRIES, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that on **August 13, 2012** I electronically filed the foregoing with the Clerk of Court using the ECF system which will send notification of such filing to the following:

Richard S. Fry
Nancy J. Penner
Jennifer E. Rinden
SHUTTLEWORTH & INGERSOLL P.L.C.
115 Third Street S.E., Suite 500
P.O. Box 2107
Cedar Rapids, IA  52406-2107
Telephone: (319) 365-9461
Facsimile: (319) 365-8725
E-mails: rsf@shuttleworthlaw.com
           njp@shuttleworthlaw.com
           jer@shuttleworthlaw.com
**ATTORNEYS FOR PLAINTIFF**

*/s/ Ryan G. Koopmans*