IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
DAVENPORT DIVISION

ARCHER-DANIELS-MIDLAND
COMPANY,

        Plaintiff,                        No. 3-10-cv-100-CRW-CFB

vs.                                 FINDINGS, CONCLUSIONS OF LAW,
                                      and DIRECTION FOR JUDGMENT

ROBINSON INDUSTRIES, INC.,

        Defendant.

        A bench trial of all pleaded issues was held in Davenport on November 5 through 9, after the parties during a November 2 pretrial conference agreed to waive jury. Extensive pretrial discovery and hearings on well-briefed motions preceded trial. Following trial, the parties simultaneously submitted proposed decisions and then replies to each. Thereafter the court granted their request to present closing arguments; the court received those summations by telephone conference call held on January 10, 2013.[1]

        The court now enters its findings of fact, conclusions of law, and final order directing the clerk of court to enter (1) judgment for defendant Robinson Industries, Inc. (Robinson) dismissing the claims of plaintiff Archer-Daniels-Midland Company (ADM), and (2) judgment for ADM dismissing the counterclaims of Robinson. Both parties shall bear their own costs.

        I.  Findings of Fact.

---

[1] I regret the three-month delay after trial before entry of this final decision. Counsel well presented the law, facts, and analysis of scientific and engineering principles that have fully challenged the court's ability to achieve a final correct decision.

A. The court accepts as true the one paragraph of facts stipulated by the parties in their proposed pretrial order filed on October 23, 2012. This is a civil case brought by ADM against the defendant Robinson. ADM alleges that Robinson was negligent and breached a contract and express and implied warranties in connection with industrial fans that Robinson sold to ADM. Robinson denies that it was negligent or that it breached any contract or warranties. Robinson has also filed a counterclaim for the value of the replacement fans, spare fans, and a housing that it provided to ADM after the first fans cracked and one exploded. ADM denies that it owes Robinson any money for the replacement fans, but ADM did stipulate that Robinson had not been paid $690,702 for the replacement work and equipment provided to ADM after the November 26, 2008 explosion.

Many other factual circumstances that gave rise to the claims and counterclaims are not seriously disputed. In 2005, ADM already was operating several cogeneration plants in Iowa and Illinois, was very experienced in how they should be operated, and began designing and constructing a similar plant in Clinton, Iowa. At ADM's request, boiler manufacturer Kvaerner Power designed specifications for three huge coal-fired boilers and auxiliary equipment, including three very large induced-draft fans used to move air in and out of the boilers. Robinson responded to a request for bids and was selected by ADM from among several bidders to provide the fans.

A dispute central to the parties' claims and counterclaims concerns the terms of their final sales contract, initially consisting of several bid proposals by Robinson and an ADM purchase order #192754. The contract was not finalized until they signed a short two-page document entitled "Agreement of Separately Negotiated Terms" (Separate Agreement). The

parties vigorously dispute how the court should construe that pivotal contract document.

During three months of start-up and initial operation of Fan Number One beginning in August of 2008, ADM experienced some unexpected vibration in the fan duct work. Then on November 26, 2008, Fan Number One failed in a catastrophic explosion that destroyed the fan and damaged its housing and the surrounding building and equipment. A second replacement fan later developed cracks and was replaced by Robinson.

The parties cooperated in investigating the cause of the failure, then agreed on a modified design for replacement fans built and shipped to ADM by Robinson. The parties swiftly worked together to install the fans and boilers in the cogeneration plant; and their fix has been successful.

ADM was damaged by the explosion in that the fans, fan housing, and the surrounding building were severely damaged, and ADM temporarily lost the use of its plant for grain processing and power generation. Robinson too sustained damage, as it has not been paid for the work it performed after the explosion in investigating and helping to redesign and rebuild fans for the ADM boilers.

B. The court accepts as fundamentally true the factual information contained in the parties' many documents received in evidence as exhibits. The court does sustain Robinson's objections to Exhibit 41 and all testimony relating to the parties' meeting on January 21, 2009, when they met to discuss how to remedy the fan wheel cracks. They agreed in writing in advance of the meeting that statements made during the meeting would "not be utilized as evidence in the event of litigation." Also, the court gives no probative value to ADM's proffered evidence concerning what Robinson informed its liability insurer about the cause of the fan failure.

Although technically admissions, the statements Robinson personnel made to its liability insurer did not provide credible proof to support any of ADM's several theories for recovery of damages. The court overrules all other objections to the exhibits and testimony of witnesses, but the court has considered all objections made at trial and in the pretrial order by both parties in weighing the evidentiary value of the challenged exhibits and testimony.

      C.  Before the court resolves disputed factual issues and decides the parties' damage claims, the court must address the parties' Separate Agreement that they used in an attempt to clarify and finalize their purchase and sale contract.

      The Separate Agreement was drafted and signed by Robinson's McMaster on October 11, 2005 and signed by ADM's Habrock on October 27, 2005. Both testified briefly that the purpose of the Separate Agreement was to have Robinson "extend the standard warranty" to twelve months after start-up, and to modify the payment terms. But the parties entirely disagree about what was the "standard warranty" that they extended and what are the specific "conflicting or differing terms" of their exchanged proposals.

      The Separate Agreement states in pertinent part:

> [T]his agreement pertains and relates to [ADM]'s Purchase Order No. 192754 and Robinson's Quotation/Proposal No. D7085-04, both of which contain various terms and conditions, some of which may be in direct conflict. Both [ADM] and Robinson are aware of the potential problems and uncertainty associated with matters of contract formation, interpretation and enforcement which result from the exchange of separately drafted and varying terms and conditions, and so desire by this Agreement to reflect their agreement and meeting of the minds as to certain key and critical matters espoused herein. Robinson and [ADM] both agree that this Agreement shall govern and supersede any conflicting or differing terms or agreements, express or implied, relative to the specific subject matters reflected herein, as are otherwise contained within or resulting from the exchange of the aforementioned

>[ADM]'s Purchase Order and Robinson's Quotation/Proposal. Those terms and conditions set forth in [ADM]'s Purchase Order and Robinson's Quotation/Proposal which are consistent and do not conflict shall remain the same.

ADM Exhibit 10. This language was followed by the two paragraphs that McMaster and Habrock used to (1) extend the length of the standard warranty, and (2) provide new progressive payment terms.

At the end of the Separate Agreement was a final fine-print sentence that was also printed on all previous Robinson proposals. This "Guarantee" is a good summary of the Express Warranty (¶ 8A) and Remedy (¶8F) provisions in Robinson's referenced Quotation/Proposal:

>Guarantee: The above material fully guaranteed for a period of one year from date of shipment free from defects in design, materials and workmanship; any part or parts becoming defective within this time to be replaced free of charge, f.o.b. factory.

That "Guarantee" language and the Robinson warranty in paragraphs 8A and 8F are consistent with the warranty language of paragraph 5 of the referenced ADM Purchase Order.

The court concludes that the Robinson "standard warranty" that was extended in the Separate Agreement is the Express Warranty (¶8A) and Remedy (¶8F) of its Quotation/Proposal No. D7085-04.

ADM contends that the final Robinson Quotation/Proposal was open only for thirty days and had expired before the Separate Agreement was signed, so the only express warranty is that in the ADM Purchase Order. The court disagrees. The Separate Agreement explicitly refers not to ADM's but to Robinson's Standard Warranty. Morever, the Separate Agreement explicitly identifies and thereby revives Robinson's " Quotation/Proposal No. D7085-

04, " except to the extent its terms conflict with the ADM Purchase Order terms.

Robinson contends the Separate Agreement, in extending the time of the Robinson "Standard Warranty," incorporated and activated not only paragraphs 8A and 8F but also paragraphs 8B- 8J, inconclusive, and thereby added to the sales agreement numerous Robinson disclaimers of warranties, waivers, and other limitations on ADM's rights to seek damages. The court finds that interpretation unsound. The court must strictly construe the contract provisions that limit a party's rights. See Theobold v. Weber, 143 N.W.2d 418, 422 (Iowa 1966). Those Robinson disclaimers are entirely inconsistent with the language in ADM's referenced purchase order. Moreover, those disclaimers and remedy limitations would largely erase the Standard Warranty that the parties agreed to extend, as well as the Guarantee language that is not so limited.

Consequently, the court concludes the Separate Agreement constitutes a novation as to the parties' final sales contract. The Robinson "Standard Warranty," in paragraphs 8A and 8F, as summarized in the fine-print "Guarantee," constitutes the parties' contract language that governs their claims and counterclaims. This interpretation and construction of the parties' contract documents is consistent with the guiding legal principles set forth in the parties' briefs concerning interpretation and construction of written contracts in Iowa. See Iowa Code § 554.2316 (warranty disclaimers); Advance Elevator Co. v. Four State Auto Supply Co., 572 N.W.2d 186, 188 (Iowa App. 1997)(burden on party seeking benefit of contract to prove its terms); Theobald v. Weber, 143 N.W.2d at 422 (provisions of contract restricting party's legal rights are strictly construed); see generally Tralon Corp. v. Cedarapids, Inc., 966 F. Supp. 812, 822-24 (N.D. Ia. 1997)(cataloging Iowa cases concerning commercial contract construction and

interpretation).

    D. In deciding what facts support or detract from the parties' pleaded claims, the court must make credibility determinations by assessing each witness's demeanor, experience, expertise, and accurate recall of events and circumstances, as well as the expert witnesses' qualifications to express opinions on the many technical matters here in dispure.  An important factor for discounting some testimony was the stake in the outcome held by witnesses who were current or retired employees of ADM and Robinson.

    The witnesses whom the court has found most believable on questions of how and why the induced-draft fans failed were Robinson's former president and semi-retired engineer Les Gutzwiller, who was well-informed and believable, and also its retained engineering expert Alan Errett.  They, rather than ADM's retained engineer Robert J. Sayer, gave competent opinion testimony consistent with documentary evidence and other witnesses' recall about how ADM had been operating the fans;  and why ADM's improper damper settings and Kvaerner Power's specification of over-sized fans brought about a rotating stall condition and the catastrophic fan failure.

    The court gives less weight to the testimony of Robert Sayre, on whose opinion testimony ADM heavily relies.  Sayer initially based his opinion about the fan failure on a five-nodal theory consistent with the location of cracks in the fans.  After learning that Robinson's expert Errett had correctly based his contrary opinion on a four-nodal diameter mode developed through a finite-element analysis, Sayre changed his opinion about why the fan design was defective, causing excessive vibration.  Sayre now opines that the four-nodal diameter had a blade-pass pulsation frequency that caused the excessive excitation and vibration.

Sayre's revised theory is not credible in this case. Sayre never went beyond his computer-based mathematical analysis to attempt to replicate the failure. He could not cite any other person's study or any generally accepted scientific peer-reviewed literature supporting either his four-node or five-node blade-pass pulsation frequency theory for the failure. He theorized the excitation would put undue stress on the side plate, but the four-nodal diameter mode would likely put crack-causing stress at the fan center plate, a place where there were no cracks. Cross-examination of Sayre effectively demonstrated to the court that Sayre's opinions about the fan failure were not a reliable basis on which the court could decide why one fan catastrophically failed and another developed cracks.

The opinions presented by Robinson's independent engineering expert Alan Errett and in-house expert Les Gutzwiller were more believable and reliable than Sayre's opinions. Their engineering education and experience were equivalent to Sayre's. Gutzwiller has had considerably more fan-building experience. Errett and Gutzwiller believed the fans had been oversized as designed by Kvaerner Power. They both credibly explained the most likely cause of the fan failure was excessive vibration caused when ADM operated the over-sized fans for many hours with the inlet dampers set lower than twenty degrees open, contrary to Robinson's recommendations. This brought about excessive excitation, vibration, cracking, and severe turbulence within the fan housing.

Excessive vibration was confirmed by post-failure strain-gauge testing on the modified fan in boiler unit no. 1, as well as pre-failure records of cracks consistent with low damper settings. It is noteworthy that Sayre initially opined that the fans were grossly oversized for this boiler application, even though he later removed that idea from his final litigation report.

The Gutzwiller and Errett opinions about the fan failure are therefore given much more weight than Sayre's final opinion.

The court concludes, however, that neither party proved by a preponderance of the evidence that either ADM or Robinson was negligent, or breached its contractual and warranty duties, or was otherwise at fault, in the design, manufacture, and subsequent operation of the fans and the fan system used in the Boiler Unit No. 1 application. Granted, remedial post-failure changes in design were successfully proposed and agreed upon as a proper fix, and it worked. But neither ADM nor Robinson satisfactorily proved a single cause of the fan failures. The Robinson fans sold to ADM would probably still be in place and functioning satisfactorily, without being modified, except for the massive failure that occurred on November 26, 2006. The failure was probably caused by a combination of factors, attributable to no one party, that no party had foreseen: oversizing of the fans in the Kvaerner Power design specifications; ADM's improper initial settings of the inlet dampers causing severe turbulence and then catastrophic cracking of the fans; and Robinson's failure to detect the oversizing and to bump-test the fans. ADM acted responsibly in performing the start up of the fan system, not realizing that its damper settings were contrary to Robinson's advice and operations manual. Robinson's work in conforming its design to the Kvaerner Power requirements, its selection of materials for the fans, and its workmanship were not defective. These are the facts found by the court by a preponderance of all the evidence, to be considered in deciding whether ADM or Robinson proved the elements of any or all pleaded claims and counterclaims.

II. <u>Conclusions of Law Concerning ADM Claims</u>. Iowa law applies to this case arising out of the Clinton, Iowa construction project. The elements of each claim are correctly

set forth in the Iowa Uniform Jury Instructions provided in the parties' pretrial conference order and in their briefs.

      A.  ADM contends Robinson breached its written contract by providing fans that were defective in design, materials, and workmanship.  But Robinson did what its contract called for.  Robinson performed its obligations under the Separate Agreement by working with ADM to redesign and replace the fans, as called for in Robinson's explicit standard warranty and Guarantee language, quoted above.   Giving great weight to the expert opinions of Gutzwiller and Errett, the court concludes that ADM failed to prove that the fans were defective in material, or design, or workmanship when ADM put the fans and equipment into operation in its boiler. ADM did not prove its claim that Robinson damaged it by breaching any provision of the parties' written contract.

      B.  ADM contends Robinson breached its express warranty because it provided fans that catastrophically failed.   Robinson did not breach the only warranty expressed in the governing Separate Agreement,  the Robinson standard warranty and Guarantee quoted above. As with the breach of contract claim, ADM did not prove the fans when delivered were defective in design, materials, or workmanship attributable solely or primarily to the conduct of Robinson. So ADM did not prove its claim that Robinson caused its damages by breaching an express warranty.

      C.  ADM contends Robinson breached an implied warranty of fitness for a particular purpose, well described in the Iowa Uniform Jury Instruction No. 1100.6 and cases ADM has cited in its briefs.  ADM did not prove several elements of the implied warranty claim. Robinson supplied fans and associated equipment that complied with the ADM requirements and

Kvaerner Power design specifications. The fans initially performed as intended. ADM relied more on Kvaerner Power and on its own skill and experience than on Robinson's skill or judgment. Robinson was not responsible for Kvaerner's requirement of oversized fans for this application. ADM operated the fans at an improper throttled-down stall condition contrary to Robinson's advice and suggestions. So ADM did not prove that the fans were unfit for the particular purpose called for by the specifications ADM provided. Had the system been operated as Robinson had proposed in its manual, the fans probably would still be functioning satisfactorily without modification.

      D. ADM contends Robinson breached the implied warranty of merchantability, described in Iowa Uniform Jury Instruction No. 1100.11 and ADM's cited cases. ADM argues it proved two elements of the merchantability claim, that the fans were not fit for their ordinary purpose and would not pass the test of merchantability, regardless whether they were defective in any way. These were not off-the-shelf products. Even if ADM did not have to prove the products were defective in the way expert witness Sayre opined, these products were merchantable and fit for their ordinary purpose ADM had specified. As with the implied fitness warranty, the evidence proves the fans when delivered by Robinson were installed, accepted, and complied with Kvaerner Power's requirements, worked satisfactorily for a time, and failed for reasons not entirely attributable to Robinson's design and workmanship. ADM received and installed precisely what Robinson agreed to sell and what ADM agreed to purchase. The fans and associated equipment sold by Robinson were merchantable.

      E. ADM contends Robinson is liable for negligent design of the fans, in accordance with the elements set forth in Iowa Uniform Jury Instruction No. 700.1 and Iowa

Code chapter 668. ADM did not prove this claim. Robinson's expert testimony was far stronger than the testimony proffered by ADM and satisfied the court that Robinson neither negligently designed nor negligently manufactured the products sold to ADM.

Whether analyzed as an ordinary negligence claim or a claim of comparative fault under Iowa Code chapter 668, ADM fell far short of proving Robinson negligent or at fault. Robinson followed the Kvaerner Power production design requirements that ADM had presented to Robinson, probably calling for fans that were oversized for this application in the Clinton facility. Whether the court applies the principles of comparative fault of Iowa Code chapter 668, or traditional negligent design principles, the court concludes that ADM did not prove its negligence claim.

Robinson is entitled to judgment dismissing all of ADM's several damage claims.

III. <u>Conclusion of Law Concerning Robinson Counterclaim</u>.

Robinson contends ADM should pay the $690,702 in expense incurred and billed for one spare induced-draft fan sent before the explosion but not thereafter used, and for the post-explosion replacement fans that Robinson redesigned and strengthened. Robinson has not proved that ADM owed any duty to pay in light of the parties' Separate Agreement by which Robinson's "standard warranty" and "Guarantee" called for Robinson to replace free-of-charge the "parts becoming defective" within the extended time of its warranty. The fans and associated equipment became defective when destroyed in the catastrophic explosion several months after start up. Robinson has offered no explanation why ADM is obligated to pay for that fan replacement work that was explicitly called for in Robinson's standard warranty and "Guarantee." ADM is entitled to judgment dismissing Robinson's counterclaim.

The court directs the clerk of court to enter final judgment in favor of Robinson Industries, Inc., dismissing all of ADM's claims, and in favor of ADM dismissing Robinson's counterclaims, with each party bearing its own costs.

IT IS SO ORDERED.

Dated this 7th day of February, 2013

```
CHARLES R. WOLLE, JUDGE
U.S. DISTRICT COURT
```